**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

RED RIVER HOLDINGS, LLC　　　*

　　　　　　　　　　　　　　　*

　　　　Petitioner　　　　　　*

　　　　　　　　　　　　　　　*

v.　　　　　　　　　　　　　　*

　　　　　　　　　　　　　　　*　　　**Civil No.: PJM 10-534**

UNITED STATES OF AMERICA　　*

　　　　　　　　　　　　　　　*

　　　　Respondent　　　　　　*

<u>**OPINION**</u>

Red River Holdings, LLC ("Red River") has appealed from a decision the U.S. Armed Services Board of Contract Appeals (the "Board") issued in favor of the United States Navy (the "Navy"). Both parties have filed cross-motions for judgment upon the administrative record, and the Court has listened to their oral arguments. For the following reasons, the Court will **DENY** the Navy's Motion for Entry of Judgment upon the Administrative Record [Paper No. 20] and **GRANT IN PART AND DENY IN PART** Red River's Cross-Motion for Entry of Judgment on the Administrative Record [Paper No. 21]. The Court will **REVERSE** the Board's construction of 48 C.F.R. § 52.212-4(l) and **REMAND** the case for reevaluation, in light of the principles articulated in this Opinion, of Red River's entitlement *vel non* to the claimed amounts it sought to recover in the proceedings below.

**I.**

For present purposes, the facts of this case are these:

In January 2001, the Navy solicited bids to charter a United States-flagged vessel for the purpose of storing and transporting ammunition overseas. With respect to any existing United States-flagged vessel, the solicitation sought a 29-month charter with an option to renew for an additional 30 months. For any other vessel, including a foreign vessel that would have to be

"reflagged"—or "redocumented"—as a United States vessel, the solicitation sought a firm 59-month charter.

In late February 2001, Red River, a shipowner and operator, submitted an offer in response to the Navy's solicitation. Approximately one month later, Red River entered into a memorandum of agreement with a third-party company, Delmas. The memorandum of agreement provided that, contingent upon the Navy's acceptance of Red River's offer, Red River would purchase from Delmas, for $13,075,000, the Bahamian-flagged vessel *MV Therese Delmas*.

Effective June 14, 2001, the Navy accepted Red River's proposal, awarding it a contract in the total amount of $50,913,040.90.[1] Under the terms of the contract and subsequent modifications, Red River agreed to reflag the *Therese Delmas* as a United States vessel, outfit it with certain specialized equipment necessary for the storage and transport of ammunition, rename the vessel the *MV A1C William H. Pitsenbarger* (the "*Pitsenbarger*"), and deliver the vessel to the Navy for a 59-month charter. To finance its purchase of the vessel, the reflagging, and the costs of modification,[2] Red River obtained a loan in the amount of $17,329,000.

Red River's contract with the Navy contained a standard termination-for-convenience clause, which read as follows:

> The Government reserves the right to terminate this contract, or any part hereof, for its sole convenience. . . . Subject to the terms of this contract, the Contractor shall be paid a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus reasonable charges the Contractor can demonstrate, to the satisfaction of the Government using its standard record keeping system, have resulted from the termination. The

---

[1] The contract price was based upon a daily hire rate of $29,907.86 for the first 365 days, and a daily hire rate of $27,270.40 for the balance of the contract.

[2] The costs of the necessary modifications amounted to $6,513,957.

Contractor shall not be required to comply with the cost accounting standards or contract cost principles for this purpose. This paragraph does not give the Government any right to audit the Contractor's records. The Contractor shall not be paid for any work performed or costs incurred that reasonably could have been avoided.

In December 2001, after purchasing the vessel and outsourcing the completion of the required modifications, Red River delivered the *Pitsenbarger* to the Navy at the Military Ocean Terminal in Sunny Point, North Carolina. Shortly thereafter, the vessel, which was staffed by a crew supplied by Red River, was deployed to Diego Garcia in the Indian Ocean. Pursuant to the contract between the parties, the vessel was scheduled for redelivery[3] in November 2006.

By letter dated March 16, 2005, the Navy advised Red River that the United States Air Force—the Navy's "customer" for the charter—had indicated that it might request redelivery of the *Pitsenbarger* in September 2006, approximately two months before the end of the Navy contract. In its letter, the Navy asked Red River to estimate its costs associated with such early redelivery. On April 15, 2005, Red River advised the Navy via e-mail that early redelivery would cost approximately $706,672.47. This amount was an aggregation of loan principal, interest, and insurance payments covering the period between early redelivery in September 2006 and the scheduled end of the contract in November 2006. These costs, according to Red River, represented amounts associated with the acquisition and operation of the *Pitsenbarger* that could not be recouped if the vessel were redelivered two months early. Many months later, in January 2006, Red River provided a revised estimate of $672,610.18. On February 2, 2006, the Navy notified Red River that it would in fact require redelivery of the vessel two months early— between September 18 and 25, 2006.

---

[3] The "redelivery" of a vessel refers to the charterer's return of the vessel to the shipowner at the end of the charter. *See* 2 Thomas J. Schoenbaum, Admiralty and Maritime Law § 11-9 (4th ed. 2010).

The *Pitsenbarger* was redelivered on September 12, 2006. The next day, pursuant to the Navy's instructions, Red River notified the Navy of its final redelivery costs, namely $668,476.81. This consisted of $547,118.18 in loan principal, $31,055.84 in interest, and $90,302.79 in insurance payments. The Navy never responded to Red River's preliminary or final cost submissions.

On September 11, 2007, Red River filed a formal Contract Disputes Act claim, seeking an equitable adjustment to cover its final cost submission. A contracting officer denied Red River's claim, concluding that the early redelivery was a termination for convenience, and that Red River's claimed costs were not recoverable under the contract's termination-for-convenience clause. The Navy suggested that early redelivery actually benefited Red River because it made the *Pitsenbarger* available for a follow-on contract with the Navy— "contract 3301"—that Red River might otherwise not have been able to obtain.

Red River appealed the contracting officer's decision to the U.S. Armed Services Board of Contract Appeals, arguing that, in addition to its $668,476.81 final cost submission, it was also entitled to general and administrative expenses in the amount of $17,421.12, as well as profits in the amount of $109,743.67. Alternatively, Red River argued that, if the Board were to conclude that it was not entitled to recover costs associated with loan principal and interest payments, it should instead be permitted to recover vessel depreciation costs in the amount of $272,845.80, plus shipyard costs of $190,353.54. The shipyard costs were calculated by prorating both costs incurred in reflagging the *Pitsenbarger* and costs incurred in completing the specialized modifications required by the contract.

The Board denied Red River's appeal. It reasoned that the language in § 52.212-4(l) of the Federal Acquisition Regulation ("FAR"), which permits contractors to recover "reasonable

charges . . . [that] have resulted from the termination" of a contract for the Government's convenience, 48 C.F.R. § 52.212-4(l), allows recovery only for costs incurred after a contract has been terminated (i.e., settlement costs), and not for costs incurred in preparation for contract performance that cannot be recouped as a result of termination.

Red River appealed the Board's decision to the Federal Circuit, but when it became apparent that the appeal should have been filed in district court,[4] the Federal Circuit transferred the case to this Court. After the Court heard oral argument on the parties' cross-motions for judgment upon the administrative record, it deferred its ruling on the motions and directed the parties to file supplemental briefing on the issue of Red River's possible entitlement to insurance costs and/or costs associated with the customized re-tooling of the *Pitsenbarger*. The parties have now submitted their supplemental briefs, and the Court is prepared to rule on their cross-motions.

## II.

Pursuant to the Contract Disputes Act, a federal court reviewing a decision of an agency Board of Contract Appeals shall not set aside any factual determination of the Board unless the determination is "fraudulent, or arbitrary, or capricious, or so grossly erroneous as to necessarily imply bad faith, or if such decision is not supported by substantial evidence." 41 U.S.C. § 609(b); *see also Johnson v. All-State Constr., Inc.*, 329 F.3d 848, 851 (Fed. Cir. 2003). A Board's decisions on matters of law, on the other hand, are reviewed under what is essentially a *de novo* standard. *See* 41 U.S.C. § 609(b) ("[T]he decision of the agency board on any question of law shall not be final or conclusive . . . ."); *see also United States v. Lockheed Corp.*, 817 F.2d 1565, 1567 (Fed. Cir. 1987) ("Under our scope of review, the Board's conclusions of law are not

---

[4] Appeals from the Board involving maritime contracts are properly brought in district court rather than the Federal Circuit. *See Dalton v. Sw. Marine, Inc.*, 120 F.3d 1249, 1251 (Fed. Cir. 1997).

final and are thus freely reviewable."). "Notwithstanding this lack of deference," a reviewing court should "carefully consider[] the Board's expertise in interpreting government contracts." *Grumman Aerospace Corp. v. Wynne*, 497 F.3d 1350, 1356 (Fed. Cir. 2007). In other words, a reviewing court should "give careful consideration and great respect to a board's interpretation because legal interpretations by tribunals having expertise are helpful even if not compelling." *Fruin-Colnon Corp. v. United States*, 912 F.2d 1426, 1429 (Fed. Cir. 2007); *see also Lockheed*, 817 F.2d at 1567.

In the present case, where the parties are in essential agreement on the material facts, and where the Court's review must necessarily focus on the meaning of certain provisions of the FAR, the Court's inquiry is essentially limited to matters of law. Accordingly, while the Court will "carefully consider[] the Board's expertise in interpreting government contracts," *Grumman*, 497 F.3d at 1356, it ultimately owes less deference to that tribunal's legal conclusions, *see, e.g.*, *Lockheed*, 817 F.2d at 1567.

### III.

The Government's right to terminate a contract for its own convenience is "[o]ne of the few exceptions to the common law requisite mutuality of contract . . . ." *Maxima Corp. v. United States*, 847 F.2d 1549, 1552 (Fed. Cir. 1988). This concept, which is unique to government contracting, arose from the unpredictable nature of wartime procurement and first appeared after the end of the Civil War, "to facilitate putting a speedy end to war production." *Id.* Following World War II, the Government began to apply the termination-for-convenience concept to peacetime and non-military procurement as a means of achieving the same fundamental goal—namely, to reduce "governmental liability for breach of contract, by allocating to the contractor a share of the risk of unexpected change[s] in circumstances." *Id.*

At the same time, courts have frequently noted that there are limits on the extent to which the concept may be used to shift the risk of unexpected circumstances to contractors. Indeed, "[a] contractor is not supposed to suffer as the result of a termination for convenience of the Government, nor to underwrite the Government's decision to terminate." *Jacobs Eng'g Group, Inc. v. United States*, 434 F.3d 1378, 1381 (Fed. Cir. 2006) (internal citation and quotation marks omitted). In fact, "the overall purpose of a termination for convenience settlement is to fairly compensate the contractor and to make the contractor whole for the costs incurred in connection with the terminated work." *Nicon, Inc. v. United States*, 331 F.3d 878, 885 (Fed. Cir. 2003).

Generally speaking, the Government's standard termination-for-convenience clauses, which are promulgated in the Federal Acquisition Regulation, permit a contractor to recover various types of costs. "Typical costs encompass, *inter alia*, the cost of preparations made, work done, and reasonable profit on these." *Int'l Data Prods. Corp. v. United States*, 492 F.3d 1317, 1323 (Fed. Cir. 2007). Section 52.249-2(g) of the FAR, for instance, governs what a contractor may ordinarily recover when the Government terminates a fixed-price contract for its convenience:[5]

> If the Contractor and the Contracting Officer fail to agree on the whole amount to be paid because of the termination of work, the Contracting Officer shall pay the Contractor the amounts determined by the Contracting Officer as follows . . . :
>
> (1) The contract price for completed supplies or services accepted by the Government . . . not previously paid for . . . .
>
> (2) The total of —
>
>> (i) The costs incurred in the performance of the work terminated, including initial costs and preparatory expense allocable thereto . . . ;

---

[5] Section 49.502(b)(1)(i) of the FAR requires a contracting officer to include the provisions of § 52.249-2 in most solicitations and contracts "when a fixed-price contract is contemplated . . . ." *See* 48 C.F.R. § 49.502(b)(1)(i).

(ii) The cost of settling and paying termination settlement proposals under terminated subcontracts that are properly chargeable to the terminated portion of the contract . . . ; and

(iii) A sum, as profit . . . , determined by the Contracting Officer . . . to be fair and reasonable . . . .

(3) The reasonable costs of settlement of the work terminated, including—

(i) Accounting, legal, clerical, and other expenses reasonably necessary for the preparation of termination settlement proposals and supporting data;

(ii) The termination and settlement of subcontracts (excluding the amounts of such settlements); and

(iii) Storage, transportation, and other costs incurred, reasonably necessary for the preservation, protection, or disposition of the termination inventory.

48 C.F.R. § 52.249-2(g). Thus, under § 52.249-2(g), a contractor whose fixed-price contract is terminated for the Government's convenience will typically be entitled to recover: (1) the contract price for completed products or services accepted by the Government; (2) costs already incurred in the performance of the contract, including preparatory expenses; (3) costs associated with the termination of subcontracts; and (4) reasonable profits.

Complicating matters, however, is the fact that, in 1994 Congress passed, and President Clinton signed into law, the Federal Acquisition Streamlining Act (the "FASA"), Pub. L. No. 103-355, 108 Stat. 3243 (codified in scattered sections of 10 U.S.C. and 41 U.S.C.). The stated purposes of the FASA were, among others, to "revise and streamline the acquisition laws of the federal government in order to reduce paperwork burdens, facilitate the acquisition of commercial products, . . . and increase the efficiency and effectiveness of the laws governing the manner in which the government obtains goods and services." *See* S. Rep. No. 103-258, at 1-2 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 2561, 2562.

Subsequent to the passage of the FASA, the Government promulgated various changes to the FAR in order to implement the FASA's mandates for the acquisition of commercial items.[6] *See* Federal Acquisition Regulations for the Acquisition of Commercial Items (Final Rule), 60 Fed. Reg. 48,231 (Sept. 18, 1995) (to be codified in scattered sections of 48 C.F.R.). Notably, the newly-promulgated regulations established, for commercial items contracts, termination-for-convenience guidelines different from those prescribed elsewhere in the FAR:

> The clause at [48 C.F.R. §] 52.212-4 permits the Government to terminate a contract for commercial items either for the convenience of the Government or for cause. However, the paragraphs in 52.212-4 entitled "Termination for the Government's Convenience" and "Termination for Cause" contain concepts which differ from those contained in the termination clauses prescribed in part 49. *Consequently, the requirements of part 49 do not apply when terminating contracts for commercial items and contracting officers shall follow the procedures in this section. Contracting officers may continue to use part 49 as guidance to the extent that part 49 does not conflict with this section and the language of the termination paragraphs in 52.212-4.*

48 C.F.R. § 12.403(a) (emphasis added). Specifically, the newly-promulgated regulations established the following termination-for-convenience guidelines for commercial items:[7]

> Subject to the terms of this contract, the Contractor shall be paid a *percentage of the contract price* reflecting the percentage of the work performed prior to the notice of termination, *plus reasonable charges* the Contractor can demonstrate to the satisfaction of the Government using its standard record keeping system, have *resulted from the termination*. The Contractor shall not be required to comply with the cost accounting standards or contract cost principles for this purpose. This paragraph does not give the Government any right to audit the Contractor's

---

[6] Generally speaking, a "commercial item" is "[a]ny item, other than real property, that is of a type customarily used by the general public or by non-governmental entities for purposes other than governmental purposes . . . ." *See* 48 C.F.R. § 2.101. Included within the definition are items that have been modified pursuant to Government specifications, provided that the modifications are: "of a type customarily available in the commercial marketplace"; *or* "*minor* modifications of a type not customarily available in the commercial marketplace made to meet federal Government requirements." *See id.* (emphasis added). In the present case, the parties appear to agree that their contract is subject to the provisions of the FAR regulating commercial items.

[7] Section 12.301(b)(3) of the FAR instructs a contracting officer to include the provisions of § 52.212-4 in solicitations and contracts for commercial items. *See* 48 C.F.R. § 12.301(b)(3).

records. The Contractor shall not be paid for any work performed or costs incurred which reasonably could have been avoided.

48 C.F.R. § 52.212-4(l) (emphasis added). Thus, pursuant to § 52.212-4(l), a contractor whose commercial items contract is terminated for the Government's convenience will be entitled to recover: (1) a *percentage of the contract price* reflecting the percentage of the work performed prior to the notice of termination; and (2) *reasonable charges that have resulted from the termination*.[8] Noticeably missing from § 52.212-4(l) is any explicit mention of initial costs or preparatory expenses, costs associated with the termination of subcontracts, or reasonable profits.

Other sections of the FAR reinforce the termination-for-convenience provisions outlined in § 52.212-4(l). Section 12.403(d)(1), for instance, provides that, when the Government terminates a commercial items contract for its own convenience, the contractor is entitled to:

(i)(A) The percentage of the contract price reflecting the percentage of the work performed prior to the notice of the termination for fixed-price or fixed-price with economic price adjustment contracts; . . . and

(ii) Any *charges* the contractor can demonstrate *directly* resulted from the termination.

48 C.F.R. § 12.403(d)(1) (emphasis added).

It goes without saying that the newly-promulgated termination-for-convenience regulations outlined in §§ 12.403 and 52.212-4 are ambiguous with respect to precisely how they modified the termination-for-convenience provisions applicable to government contracts

---

[8] As discussed in footnote 16, *infra*, § 52.212-4(l)'s use of the term "reasonable *charges*," as opposed to "reasonable *costs*," is significant. In fact, the use of the term "reasonable charges" did not appear in the proposed version of § 52.212-4, which referred instead to "actual direct costs." *See* Federal Acquisition Regulations for the Acquisition of Commercial Items (Proposed Rule), 60 Fed. Reg. 11,198, 11,215-16 (Mar. 1, 1995) ("Subject to the terms of this contract, the Contractor shall be paid a reasonable termination charge considering the percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus *actual direct costs* that the Contractor can demonstrate have resulted from the termination.") (emphasis added).

generally. Specifically, the relevant FAR provisions do not indicate precisely what types of costs or charges may constitute "reasonable charges . . . [that] have resulted from the termination."

Case law and commentary add little clarity. On a few occasions, the United States Court of Federal Claims has noted that, as in the case of *any* termination for convenience by the Government, "anticipatory profits and consequential damages are not recoverable" when the Government terminates a commercial items contract. *See Digital Techs., Inc. v. United States*, 89 Fed. Cl. 711, 733-34 (Fed. Cl. 2009); *Praecomm, Inc. v. United States*, 78 Fed. Cl. 5, 12 (Fed. Cl. 2007). In addition, one decision of the Court of Federal Claims involving a commercial items contract stated, in *dicta*, that "[w]hen a fixed-price contract . . . is terminated for convenience, it essentially is converted into a cost reimbursement contract." *Praecomm*, 78 Fed. Cl. at 12. These decisions, however, do not address the precise issue before the Court in the case at bar—that is, the scope of § 52.212-4(l)'s reference to "reasonable charges . . . [that] have resulted from the termination."

Decisions of the various Government Boards of Contract Appeals have been somewhat more illuminating. Most notably, a handful of Board decisions have explicitly or implicitly rejected the argument, advanced by the Navy in the present case, that "reasonable charges . . . [that] have resulted from the termination" encompass only those costs incurred *subsequent* to the termination for convenience (i.e., settlement costs). *Jon Winter & Associates*, decided by the Department of Agriculture Board of Contract Appeals, is most instructive on this point:

> [T]he contracting officer incorrectly interprets the 'reasonable charges' portion of the clause. The language of the clause does not state that charges resulting from the termination must have been incurred subsequent to the termination for convenience; the clause does not expressly limit the additional relief to settlement expenses. The clause permits payment of reasonable charges that have resulted from the termination. A contractor may have reasonably incurred costs in

anticipation of performing the entire contract, but those costs may not be fully reflected as a percentage of the work performed.

*Jon Winter & Assocs.*, Dep't Agric. Bd. Contract App. No. 2005-129-2, 2005 AGBCA LEXIS 31, at *17-18 (June 20, 2005); *see also Corners & Edges, Inc. v. Dep't of Health & Human Servs.*, Civilian Bd. Contract App. Nos. 693, 762, 2008-2 B.C.A. (CCH) ¶ 33,961 (Sept. 23, 2008) (in a commercial items case, broadly construing "reasonable charges that . . . resulted from the termination"); *Divecon Servs., LP v. Dep't of Commerce*, Gen. Servs. Admin. Bd. Contract App. Nos. 15997-COM, 16057-COM, 2004-2 B.C.A. (CCH) ¶ 32,656 (June 22, 2004) (in a commercial items case, awarding several pre-termination incurred costs after a termination for convenience); *Dehdari Gen. Trading & Contracting*, Armed Servs. Bd. Contract App. No. 53987, 2003-1 B.C.A. (CCH) ¶ 32,249, at 159,450 (Apr. 18, 2003) (in a commercial items case, stating that a contractor would have been entitled to pre-termination payments made to a supplier in anticipation of full contract performance if it had submitted some proof or evidence in support of those costs).

It should be obvious that *Jon Winter* and the other Boards of Contract Appeals cases cited are at odds with the Board's decision in the present case, which: (1) essentially held that "reasonable charges . . . [that] have resulted from the termination" encompass only settlement expenses; and (2) ultimately concluded that none of Red River's claimed expenses—including loan principal, interest, insurance costs, modification costs, general and administrative expenses, and profit—were compensable under § 52.212-4(l). *See Red River Holdings, LLC*, Armed Servs. Bd. Contract App. No. 56316, 2009-2 B.C.A. (CCH) ¶ 34,304, at 169,457 (Nov. 4, 2009).

Thus, in the final analysis, this case presents the Court with the task of determining, with minimal guidance, whether § 52.212-4(l)'s reference to "reasonable charges . . . [that] have resulted from the termination" encompasses only settlement expenses, or, rather, whether it

might also encompass other expenses incurred prior to termination in anticipation of full contract performance that, as a result of contract termination, cannot be recouped.[9]

**IV.**

At the outset, it is important to note that the parties agree that their contract is subject to the provisions of the FAR regulating commercial items. They also agree that the Navy has already paid Red River "a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination," as required by § 52.212-4(l) of the FAR and by the termination-for-convenience clause in the parties' contract. Thus, the remaining dispute concerns only the question of whether the additional expenses for which Red River seeks reimbursement—i.e., loan principal, interest, insurance costs, modification costs, general and administrative expenses, and profit—constitute "reasonable charges . . . [that] have resulted from the termination" within the meaning of § 52.212-4(l). Here, the parties' respective positions diverge considerably.

**A.**

In the Navy's view, § 52.212-4(l)'s reference to "reasonable charges . . . [that] have resulted from the termination" contemplates only those costs that *directly* flow from the *act of contract termination itself*—and *not* costs incurred *prior to* termination in anticipation of full contract performance. In other words, "reasonable charges . . . [that] have resulted from the termination" are essentially limited to settlement expenses—that is, costs incurred in the process of winding down a terminated contract. These would include, among other things, accounting,

_____

[9] Apart from the administrative decisions, there has been minimal public commentary on this issue. Research uncovered one report that merely identifies the dilemma, *see* Federal Publications, LLC, Commercial Item Acquisition 44-47 (2007) (noting that the meaning of the phrase "charges . . . [that] resulted from the termination" remains an "open issue"), and one article that argues that the Board's decision in the present case was "fundamentally unfair," *see* Paul J. Seidman, *Termination for Convenience of FAR Part 12 Commercial Item Contracts: Is Fair Compensation Required?*, 24 Nash & Cibinic Report, No. 8, Aug. 2010, ¶ 37.

legal, and clerical expenses necessary for the preparation of settlement proposals, as well as costs associated with the settlement of subcontractor claims. *See* 48 C.F.R. § 52.249-2(g)(3) (describing settlement expenses). But, such costs would *not* include loan principal and interest expenses, insurance costs, product modification costs, or any other costs incurred prior to contract termination in anticipation of full contract performance. This, in essence, was the view expounded by the Board in the decision below, and it is what the Navy adopts in full on appeal.

The Navy also advances the somewhat tangential argument that, irrespective of the specific regulatory provisions at issue here, nothing in the FAR or elsewhere entitles Red River to full recovery in a single contract of the acquisition cost of a capital asset—particularly an asset that remains available for use in future contractual engagements. The Navy points out that its initial solicitation did not limit its request for bids to contractors who would need to acquire and customize a vessel in order to meet its specifications, but, rather, was essentially indifferent between bidders who already owned vessels and those who would need to obtain and retool a vessel in order to meet the Navy's needs. The Navy argues that Red River's theory of cost recovery would make the Government's exposure to early termination costs wholly dependent upon a contractor's independent financing arrangements:

> Red River admits that, had the [Navy] simply contracted with a company that already owned a vessel at the time of contract award, [the Navy] would not have to pay for vessel acquisition costs as part of the termination. This position highlights the difficulty of Red River's position. Under Red River's theory, [the Navy's] liability for termination could vary wildly based upon the pre-contract circumstances of the contractor it selected—when the contract is simply for a 59-month vessel charter (not acquisition)—even though nothing in the contract indicates that the contractor is required to disclose its financing arrangements for its contract inventory to the Government. Nothing in the record indicates that, prior to contract award or even contract termination, [the Navy] had any particular knowledge that Red River had purchased the *Pitsenbarger* through a financing arrangement requiring repayment within the 59-month contract performance period. Red River's interpretation of the Part 12 contract clause, which would

> make termination costs in commercial item procurements wholly dependent upon the contractor's independent and individualized financing arrangements, would make it impossible for the Government to make contracting decisions with any sense of potential impact upon the public fisc.[10]

Respt.'s Resp. to Petr.'s Cross-Mot. for J. [Paper No. 24], at 6-7. Thus, in addition to arguing that that the costs Red River seeks to recover are not contemplated by § 52.212-4(l), the Navy argues that, early contract termination aside, nothing in the parties' agreement or elsewhere entitles Red River to full recovery of the acquisition cost of a capital asset it would ultimately retain for other uses after the expiration of the present contract.[11]

## B.

According to Red River, § 52.212-4(l)'s reference to "reasonable charges . . . [that] have resulted from the termination" contemplates more than merely settlement costs incurred after contract termination. In its view, reasonable charges resulting from contract termination also include *any* reasonable costs incurred in anticipation of contract performance that, but for the termination, would have been recouped. These include, according to Red River, loan principal and interest expenses and insurance costs it says it would have recovered had the Navy not terminated the parties' contract two months early.

Red River argues that the purpose of the FASA—and the FAR revisions implemented subsequent to its passage—was to streamline federal procurement and facilitate the acquisition of commercial products, not to somehow abrogate the fair compensation principles that have long

_____

[10] This argument may have some surface appeal, but a closer inspection would appear to be in order. From this record, it cannot be definitively determined whether a different bidder, one who already owned a vessel requiring no modification, could have met the Navy's requirements. Had that been the case, the Navy could have selected that bidder. But it did not do so, instead choosing Red River, presumably with the understanding that Red River would be financing the purchase and modification of a vessel.

[11] The Navy notes that Red River continues to offer the *Pitsenbarger*, now known as the *MV Black Eagle*, for use on other government contracts. *See Red River Holdings, LLC v. United States*, 87 Fed. Cl. 768, 773 (Fed. Cl. 2009) (describing the vessel's name change and use in government contracts after 2006).

informed contractor reimbursement after terminations for convenience. Along these lines, Red River asserts that the most critical distinction between § 52.212-4(l) and those provisions of the FAR that no longer apply to commercial items is not found in its compensation provisions, but rather in its admonitions that: (1) the "[c]ontractor shall not be required to comply with the cost accounting standards or contract cost principles for [the] purpose [of demonstrating entitlement]"; and (2) "[t]his paragraph does not give the Government any right to audit the Contractor's records." *See* 48 C.F.R. § 52.212-4(l). These provisions, Red River maintains, reflect the streamlining and burden-eliminating purposes of the FASA, and thus constitute the pivotal distinction between § 52.212-4(l) and other termination-for-convenience provisions in the FAR.

Red River also notes that the newly-promulgated FAR provisions expressly state that "[c]ontracting officers may continue to use part 49 as guidance to the extent that part 49 does not conflict with this section and the language of the termination paragraphs in 52.212-4." 48 C.F.R. § 12.403(a).[12] With this provision in mind, Red River points to those sections of the FAR, such as § 52.249-2(g), that expressly permit recovery of incurred costs and reasonable profits, *see* 48 C.F.R. § 52.249-2(g), and argues that—because those provisions are not, in its view, in "conflict" with § 52.212-4(l)—they should guide a decision-maker in determining what types of charges are recoverable when a commercial items contract is terminated for the Government's convenience. It then goes on to argue that such charges must include not only settlement

---

[12] Notably, § 49.201(a) of the FAR provides: "A settlement should *compensate the contractor fairly for the work done and the preparations made for the terminated portions of the contract, including a reasonable allowance for profit.* Fair compensation is a matter of judgment and cannot be measured exactly. In a given case, various methods may be equally appropriate for arriving at fair compensation. The use of business judgment, as distinguished from strict accounting principles, is the heart of a settlement." 48 C.F.R. § 49.201(a) (emphasis added).

expenses, but also loan principal and interest payments, insurance costs, general and administrative expenses, and reasonable profits.

In Red River's view, even in a post-FASA world, the costs recoverable when a commercial items contract is terminated for the Government's convenience are essentially the same as those that were recoverable pre-FASA and those that remain recoverable, pursuant to other provisions in the FAR, for non-commercial items contracts.

## V.

The Court concludes that both parties' interpretations of the applicable FAR provisions are wide of the mark.

## A.

Adoption of the Navy's view, the Court concludes, would impose an unduly narrow interpretation of § 52.212-4(l) that would be inconsistent with the purposes of the FASA and would unjustifiably disavow the fairness principles that have long informed disputes involving government contracts.

As noted *supra*, the Navy's view—and the view propounded by the Board in the proceedings below—essentially maintains that § 52.212-4(l)'s reference to "reasonable charges . . . [that] have resulted from the termination" contemplates settlement expenses and nothing more. Under this narrow conception of the regulation, a contractor whose commercial items contract is terminated for the Government's convenience will *never* be able to recover preparation or other costs reasonably incurred in anticipation of full contract performance if such costs are not covered by payments made to reflect "the percentage of the work performed prior to the notice of termination," *see* § 52.212-4(l). Such a rule might well, in certain circumstances, result in monumental unfairness, particularly where a contractor has incurred significant preparation

costs—such as those associated with necessary product modifications "of a type customarily available in the commercial marketplace," *see* 48 C.F.R. § 2.101[13]—that, due to an early-stage termination, would not be adequately compensated by a percentage-of-work-performed payment.[14]

Such potential unfairness cannot plausibly be squared with the FASA, which was enacted to enhance the efficiency of government procurement, *see* S. Rep. No. 103-258, at 1-2 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 2561, 2562, and not to somehow undercut the longstanding principle that "[a] contractor is not supposed to suffer as the result of a termination for convenience of the Government, nor to underwrite the Government's decision to terminate." *Jacobs Eng'g*, 434 F.3d at 1381 (internal citation and quotation marks omitted). Absent a clear statutory expression of congressional intent to abrogate prevailing principles of fairness in the administration of government contracts, the Court declines to construe § 52.212-4(l) in a manner that might allocate a disproportionate share of the risk of unexpected changes in circumstances to contractors.[15] Accordingly, the Court declines to adopt the Board and the Navy's determination that Red River can only claim settlement costs incurred in winding up the Navy contract.

---

[13] When product modifications are neither "of a type customarily available in the commercial marketplace," *see* 48 C.F.R. § 2.101, nor "*minor* modifications of a type *not* customarily available in the commercial marketplace made to meet federal Government requirements," *see id.* (emphasis added), the modified product is ordinarily not a "commercial item," and the FAR provisions governing commercial items do not apply. In the case at bar, the parties apparently agree that the *Pitsenbarger*, even in its modified form, is a commercial item.

[14] Notably, § 52.212-4(l)'s reasonable avoidance clause makes reference to "costs incurred," which cuts against the Navy's argument that the provision only provides for payments reflecting the percentage of work performed and settlement costs, and not for other costs incurred in anticipation of contract performance. *See* 48 C.F.R. § 52.212-4(l) ("The Contractor shall not be paid for any work performed or *costs incurred* which reasonably could have been avoided.") (emphasis added).

[15] The Court also notes that, even if it were to conclude that the drafters of § 52.212-4(l) intended to modify longstanding fairness principles, which it does not, such a modification could well fail as an unreasonable interpretation of the statutory mandate set forth in the FASA, which is generally silent regarding fairness principles. *See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984) (noting that a Court does not owe deference to an agency's interpretation of a statute if the interpretation is unreasonable). The Court also notes that the Navy has not directed the Court to any provision in the FASA that might reasonably be construed as an abrogation of traditional government contracting fairness principles.

**B.**

Rejection of the Board/Navy construction of § 52.212-4(l), however, does not necessarily

lead to full embrace of Red River's interpretation, which suffers from flaws of its own. In Red

River's view, the reimbursement provisions of § 52.212-4(l) are essentially identical in meaning

to those that were applicable pre-FASA and that remain applicable, pursuant to other provisions

in the FAR, in the case of non-commercial items contracts. This interpretation fails to take into

account that the drafters of § 52.212-4(l), presumably motivated by the streamlining purposes of

the FASA, sought to replace, for commercial items contracts, the standard termination-for-

convenience reimbursement provisions with a simplified standard based primarily—though not

exclusively—on percentage-of-work-performed payments. Red River's argument that

contracting officers are essentially obliged to honor claims of *any* amounts that would have been

reimbursable pre-FASA—including profits on all incurred costs—stands in marked contrast to

the plain language of § 52.212-4(l) and the purposes of the FASA.

**C.**

In the Court's view, the interpretation of § 52.212-4(l) advanced by the Department of

Agriculture Board of Contract Appeals in the *Jon Winter* case most closely captures the

provision's true meaning. As noted *supra*, *Jon Winter* rejected the argument, adopted by the

Board and the Navy here, that "reasonable charges . . . [that] have resulted from the termination"

encompass *only* post-termination settlement costs:

> [T]he contracting officer incorrectly interprets the 'reasonable charges' portion of
> the clause. The language of the clause does not state that charges resulting from
> the termination must have been incurred subsequent to the termination for
> convenience; the clause does not expressly limit the additional relief to settlement
> expenses. The clause permits payment of reasonable charges that have resulted
> from the termination. A contractor may have reasonably incurred costs in

anticipation of performing the entire contract, but those costs may not be fully reflected as a percentage of the work performed.

*Jon Winter*, 2005 AGBCA LEXIS 31, at *17-18.

*Jon Winter* implicitly recognizes that § 52.212-4(l) establishes a two-component standard for contractor reimbursement following termination of a commercial items contract for the Government's convenience: First, it establishes a presumption that a commercial items contractor whose agreement was terminated for the Government's convenience will be adequately compensated by payment of "a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination." *See* 48 C.F.R. § 52.212-4(l). Second, recognizing that such a payment may not always adequately make a contractor whole with respect to expenses reasonably incurred in anticipation of performing the entire contract, § 52.212-4(l) also provides a "safety valve" of sorts, one that provides the contractor with an opportunity to demonstrate its entitlement to other "reasonable charges,"[16] *see id.*, that are necessary to ensure that it will be made whole, i.e., to ensure that it will not "suffer as the result of a termination for convenience of the Government," nor be forced "to underwrite the Government's decision to terminate." *Jacobs Eng'g*, 434 F.3d at 1381 (internal citation and quotation marks omitted).

---

[16] As noted in footnote 8, *supra*, the final version of § 52.212-4(l) substituted the term "reasonable *charges* . . . [that] have resulted from the termination" for "*actual direct costs* that . . . have resulted from the termination." *See* Federal Acquisition Regulations for the Acquisition of Commercial Items (Proposed Rule), 60 Fed. Reg. 11,198, 11,215-16 (Mar. 1, 1995) ("Subject to the terms of this contract, the Contractor shall be paid a reasonable termination charge considering the percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus *actual direct costs* that the Contractor can demonstrate have resulted from the termination.") (emphasis added). As one commentator has noted, the final rule's reference to "*charges*" resulting from the termination contemplates amounts that would not have been *billed* but for the termination, whereas a reference to "*costs*" resulting from the termination would have contemplated only amounts that would not have been *incurred* but for the termination. *See* Seidman, *supra* note 9. The distinction is important, since the former might include costs incurred *pre*-termination but *billed* post-termination, while the latter could be construed to include only costs incurred *post*-termination, i.e., settlement costs. *See id.* In the Court's view, the drafters of § 52.212-4(l) likely adopted the use of the word "*charges*"—as opposed to "*costs*"—in the final version of the rule so as not to expressly exclude reasonable preparation costs and the like.

Understood in this way, § 52.212-4(l) embodies the objectives of the FASA insofar as it: (1) provides a simplified procedure for the determination of contractor compensation—one based upon a simple calculation of a payment reflecting the percentage of work performed; and (2) mandates that determination of amounts due be made without requiring the contractor "to comply with the [Government's complex] cost accounting standards or contract cost principles" and without giving the Government "any right to audit the contractor's records." *See* 48 C.F.R. § 52.212-4(l). And, when understood in this way, § 52.212-4(l) also reaffirms, through its allowance for other "reasonable charges," *see id.*, the longstanding principle that "the overall purpose of a termination for convenience settlement is to fairly compensate the contractor and to make the contractor whole for the costs incurred in connection with the terminated work." *Nicon*, 331 F.3d at 885.

Having concluded that this is the appropriate understanding of the critical provision at issue, the Court holds that § 52.212-4(l) of the FAR entitles a commercial items contractor whose contract is terminated for the Government's convenience to the following: (1) payment of "a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination"; and (2) a payment as compensation for settlement costs or costs *reasonably* incurred in anticipation of contract performance, *provided such costs are not adequately reflected as a percentage of the work performed*,[17] and *provided such costs could not*

---

[17] Clearly, a contractor may not recover additional amounts, however reasonable or necessary, if the expenses with which they are associated are reflected in the percentage-of-work-performed payment. It is worth repeating that § 52.212-4(l)'s second, "reasonable charges" component contemplates *only* those expenses that—even after a percentage-of-work-performed payment—would otherwise go uncompensated. Pursuant to the regulation's plain language, the *contractor*—and not the Government—bears the burden of proving that any such charges: (a) are reasonable, (b) were not reasonably avoidable, and (c) are not reflected in the mandatory percentage-of-work performed payment. Any concern that the Court's construction of § 52.212-4(l) could erode the purposes of the FASA by "opening the floodgates" to all manner of additional charges is fully mitigated by this three-part burden of proof that the contractor must bear.

*have been reasonably avoided.*[18] To the extent that the Board's decision below concluded that §

52.212-4(l)'s reference to "reasonable charges" does not include costs incurred "solely for the

purpose of contract performance, or incurrence of costs in anticipation of such performance,"

*Red River Holdings*, 2009-2 B.C.A. (CCH) ¶ 34,304, at 169,457, that decision is inconsistent

with the Court's holding here and must therefore be **REVERSED**.

## VI.

The Court's conclusion as to the meaning of § 52.212-4(l), however, does not fully

resolve this case. The following critical questions remain:

(1)    Do Red River's claimed loan principal and interest amounts, which it paid to

finance the acquisition of a capital asset that it could—and ultimately did—retain

for use on subsequent government contracts, constitute costs reasonably incurred in

anticipation of performance of *this* contract, or are they more appropriately

categorized as amounts expended to acquire a general purpose asset for which Red

River has other uses?[19]

(2)    If the *Pitsenbarger* is in fact a general purpose asset for which Red River has other

uses, should the shipyard costs Red River incurred to modify the vessel in

---

[18] As the Court construes § 52.212-4(l), the regulation's first component—payment of "a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination"—contemplates that a percentage-of-work-performed payment will generally provide a contractor with compensation for costs incurred *and* some amount of profit on those costs. The Court thus concludes that the regulation's second, "safety valve" component—which permits compensation for any reasonable, unavoidable costs not reflected in the first component—generally does *not* contemplate *additional* allowances for profit.

[19] Typically, when an asset "is considered to be a general purpose asset for which the contractor has other uses, the only appropriate charge to the termination settlement is depreciation on the asset for the period during which it was used on the terminated contract"—and *not* the full cost of the asset. John Cibinic, Jr., Ralph C. Nash, Jr. & James F. Nagle, Administration of Government Contracts 1101-02 (4th ed. 2006) (citing *Dairy Sales Corp. v. United States*, 593 F.2d 1002, 1006 (Ct. Cl. 1979)).

preparation for its contract with the Navy be considered separately, as costs reasonably incurred in anticipation of performance of *this* contract?[20]

(3)     If the *Pitsenbarger* is in fact a general purpose asset for which Red River has other uses, should Red River be entitled to amounts reflecting asset depreciation for months 58 and 59 of its original contract with the Navy?[21]

(4)     Do Red River's claimed insurance costs constitute unavoidable costs reasonably incurred in anticipation of performance of *this* contract, or, rather, should they be categorized as costs of a type that Red River would ordinarily have to carry to insure a general purpose asset—irrespective of the asset's use in a particular contractual engagement?[22]

(5)     Can Red River's claimed general and administrative expenses be properly construed as costs reasonably incurred *prior to* the Navy's early termination of the parties' contract, or, rather, are such costs more appropriately categorized as non-compensable overhead expenses associated with the *terminated* portion of the contract?[23]

---

[20] As a rule, a contractor whose contract was terminated for the convenience of the Government is entitled to reimbursement for the "[l]oss of useful value of special tooling, and special machinery and equipment[,]" provided that the "special tooling, or special machinery and equipment *is not reasonably capable of use in the other work of the contractor*." 48 C.F.R. § 31.205-42(d)(1) (emphasis added).

[21] A critical factual question on this point is whether the *Pitsenbarger* was rendered temporarily idle by the early termination or, rather, whether it was immediately available for use on other contracts. *See Nolan Bros., Inc. v. United States*, 437 F.2d 1371, 1386-87 (Ct. Cl. 1971).

[22] Here again, whether the *Pitsenbarger* was rendered temporarily idle by the early termination is likely a critical factual inquiry.

[23] *See Walsky Constr. Co.*, Armed Servs. Bd. Contract App. No. 52772, 2001-2 B.C.A. (CCH) ¶ 31,557, at 155,857 (Aug. 6, 2001) ("The law is well-settled over many years that post-termination unabsorbed overhead is not recoverable in a termination claim.").

Although the parties have provided the Court with some briefing on these questions, the Court concludes that, because these issues either (a) were not considered by the Board in the proceedings below, or (b) were considered through the prism of a flawed interpretation of § 52.212-4(l),[24] the Court concludes that this case should be remanded to the Board for further proceedings not inconsistent with this Opinion. *See Powerine Oil Co. v. United States*, 837 F.2d 1581, 1584 (Fed. Cir. 1988) (demonstrating that a reviewing court may remand a case to a Board of Contract Appeals for factual inquiries and legal analyses not performed in the first instance); *Umpqua Marine Ways, Inc. v. United States*, No. 91-282, 1992 U.S. Dist. LEXIS 1573, at *17-18 (D. Or. Feb. 6, 1992) (remanding a maritime appeal to the Armed Services Board of Contract Appeals "for additional findings consistent with this opinion"). In re-evaluating Red River's entitlement to various categories of its claimed costs, the Board should consider the above-stated questions, as well as any others that might be pertinent, through the lens of the Court's construction of § 52.212-4(l) and other applicable principles of government contracting—be they statutory, regulatory, or as promulgated in judicial opinions.[25]

In the final analysis, the Court concludes only that the proceedings below were distorted by an inappropriate interpretation of § 52.212-4(l), and that—even after the Court's articulation of what it takes to be the proper legal standard—the general appropriateness and reasonableness of the costs Red River has claimed remain in question. The Court thus finds that, rather than making an ultimate entitlement determination based on an incomplete record, the best course of

---

[24] Indeed, the Board never reached evaluation of the reasonableness of Red River's claimed costs. After flatly determining that the costs were not allowable because they were not settlement expenses incurred post-termination, the Board dismissed them out of hand.

[25] The Court reminds the Board that, in resolving the outstanding issues on remand, it "may use part 49 as guidance to the extent that part 49 does not conflict with [part 12] and the language of the termination paragraphs in 52.212-4." 48 C.F.R. § 12.403(a).

action is to remand the case to the Board so that it may reconsider its decision and apply its usual expertise in government contracting in light of the legal principles articulated here.

## VII.

For the foregoing reasons, the Navy's Motion for Entry of Judgment upon the Administrative Record [Paper No. 20] is **DENIED**. Red River's Cross-Motion for Entry of Judgment on the Administrative Record [Paper No. 21] is **GRANTED IN PART AND DENIED IN PART**. Red River's Motion is **GRANTED** insofar as the Court **REVERSES** the Board's conclusion that § 52.212-4(l)'s reference to "reasonable charges" cannot include costs incurred "solely for the purpose of contract performance, or incurrence of costs in anticipation of such performance." Red River's Motion is **DENIED** in all other respects. In addition, this case is **REMANDED** to the Board for reevaluation, in light of the principles articulated in this Opinion, of Red River's entitlement to its claimed expenses and, if appropriate, a quantification of any expenses deemed compensable.

A separate Order will **ISSUE**.

_____ _/s/_____
**PETER J. MESSITTE**
**UNITED STATES DISTRICT JUDGE**

**May 31, 2011**